IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEFFREY LEWIS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB 09-1153 |
| THE HOME SALES COMPANY, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Jeffrey Lewis ("Lewis") brings this action against his former employer, Defendant Apartment Services, Inc. ("Apartment Services") and its corporate affiliate, Defendant The Home Sales Company, alleging it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 when it terminated him in September 2006. Lewis alleges that he was fired because he is African-American, and that his termination was also a product of retaliation for complaining to his manager about being treated unfairly. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant Apartment Services's Motion for Summary Judgment (ECF No. 16) is GRANTED.

### BACKGROUND

This Court reviews the facts relating to this claim in the light most favorable to the plaintiff. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

**A.    Apartment Services Background**

Defendant Apartment Services owns and manages approximately forty apartment and townhome communities throughout Maryland and southern Pennsylvania. Ray Wilkens Tr. 34; Trudy Via Aff. ¶ 10. Each property has on-site leasing and service staff headed by a full-time supervisor. Wilkens Tr. 23-25; Via Aff. ¶ 11. Due to the large number of properties maintained by Apartment Services, maintenance employees are often transferred between properties. Via Aff. ¶ 14.

After a 90-day probationary period, on-site service technicians and supervisors are eligible for a housing allowance of up to 100% of their rent to live in a rental unit at one of Apartment Services's properties. Via Aff. ¶ 12. To live in one of these rental units, maintenance employees must receive approval from upper management, just like any tenant, and submit a successful lease application. Hamlett Tr. 110-13; Via Aff. ¶ 14. Each time an employee moves to a new property he must obtain separate approval to live in a new rental unit. Hamlett Tr. 110-13; Via Aff. ¶ 15.

### B. Lewis's Employment with Apartment Services

Apartment Services hired Lewis in October 1999. Lewis Tr. 34-35; Summ. J. Mem. Ex. 9. From 1999 to 2004, Lewis worked as a groundskeeper at a number of Apartment Services's properties. Lewis Tr. 38-39, 41-49. In 2004, Lewis expressed an interest in becoming promoted to a service technician. *Id*. 44. In order to do so, Lewis took a one-day HVAC systems training class and subsequently passed Apartment Services's maintenance test. *Id*. 45-49. Accordingly, Apartment Services promoted Lewis to the position of maintenance technician. *Id*. After his promotion, Lewis became eligible to live in one of Apartment Services's properties rent-free. Thus, at some point in late 2004, Lewis moved into a rental unit in Apartment Services's Arbuta

Arms property. *Id*. 63-64. Lewis stayed at Arbuta Arms until at least one month after his September 2006 termination. Lewis Tr. 77-78, 164.

According to his supervisors, Lewis's performance as a maintenance technician was competent, though he had problems with authority. Jeff Steinhoff Tr. 109-10. For example, on February 24, 2005, Lewis received a written warning for insubordination after rudely challenging a decision of Jeff Steinhoff, his supervisor at the Rockdale Gardens property. *Id*.; Lewis Tr. 81-85; Summ. J. Mem. Ex. 10. Lewis concedes that in the course of being reprimanded, Steinhoff warned him that "further insubordination will result in 3 days off [without] pay or termination." Summ. J. Mem. Ex. 10 (emphasis in original). *See also* Lewis Tr. 84; Steinhoff Tr. 110, 116.

In July 2005, Lewis began working at the Orchards of Severn ("the Orchards"). Lewis Tr. 54; Summ. J. Mem. Ex. 12. At the Orchards, Lewis's supervisor was Todd Hamlett. Lewis Tr. 85. Just four months later, on November 11, 2005, Lewis quit his job at the Orchards to take on a higher-paying job at a different residential management company. Lewis Tr. 86-87. When Lewis gave his notice, Hamlett told him that if things did not work out with his new job, he could give Hamlett a call. Lewis Tr. 89. One month later, Lewis called Hamlett and asked to return to Apartment Services. *Id*. 90-91. On December 21, 2005, Lewis rejoined Apartment Services as a maintenance technician at Lawyers Hill Apartments. *Id*. 96-97.

In March 2006, Hamlett asked Lewis to transfer to Somerset Woods ("Somerset"), a large townhome community near the Orchards. Lewis Tr. 98. Lewis claims that at Somerset, he and his maintenance supervisor, Adam Pierre, who is also African-American, worked tirelessly to reduce the number of vacancies and improve the rental units. *Id*. 103-04. Pierre quit three months later, however, at which point Hamlett brought Mike King, who is Caucasian, to Somerset to fill Pierre's position as supervisor. Lewis Tr. 103-04; Hamlett Tr. 159-60. Lewis

was displeased with this turn of events, as he felt he deserved the maintenance supervisor position. Lewis Tr. 133, 137-38. Lewis contends that Hamlett's decision to bring Mike King to Somerset was a discriminatory act, and that he was not chosen to take Pierre's job because of his race. Lewis Tr. 137-39. Notably, Lewis concedes that he never expressed his interest in the position to Hamlett or anyone else at Apartment Services. *Id.* 132-33.

### C. Lewis's Allegedly Insubordinate Behavior

Apartment Services claims that, shortly after King joined Somerset in March 2006, Lewis made known his dissatisfaction with King as his new supervisor and stopped listening to his instructions. Apartment Services emphasizes two early "egregious" examples of Lewis's insubordination: 1) he refused to timely replace a resident's electrical socket, and 2) he called an outside contractor to clear a resident's drain without first checking the drain himself, as King had requested. Lewis Tr. 116-19, 183-85. King has testified as to his displeasure with Lewis's work habits, complaining that Lewis frequently failed to communicate his plans to come late to work or leave early, and often did not tell King where he was during work hours. King Tr. 131-32. King also contends that he frequently had to double-check Lewis's work because Lewis did not pay attention to his instructions. King Tr. 142-43.

At some point in late June or early July 2006, Lewis had a heated conversation with King about King's decision to take him off a certain job. Lewis Tr. 139. Lewis told King that he felt other workers were not being pulled off their jobs, and were not as closely watched as he was. *Id.* Lewis alleges that in response, King said he was "trying to make our issues a black and white thing and play the race card." *Id.* Lewis believes this statement shows that King "must have had race on his mind." Lewis Tr. 139-40. King does not remember making any comments about race during this conversation. King Tr. 150-52.

By the end of the summer of 2006, King had become extremely unhappy with Lewis's work and disobedient behavior. King claims that Lewis repeatedly missed work, taking off September 8, 12 and 22, without advance notice or approval. King Tr. 77-78, 118-19; Summ. J. Mem. Ex. 17. Lewis admits that he informed King of when he planned to take these days off by writing down the dates on King's office calendar. Lewis Tr. 195-96. Apartment Services contends that this conduct violated Apartment Services's leave policies, which require employees to request time off in writing or call into their supervisors if they are taking a sick or personal day. Hamlett Tr. 133-35; Via Aff. Ex. B.

### D. Pool Table Incident

On September 20, 2006, Hamlett found out that an employee had moved a pool table into a vacant unit in the Orchards. Hamlett Tr. 122-24. At some point later that day or the next day, Hamlett was told that Lewis was the employee who had moved in the pool table, and that Lewis played pool during his lunch break when he worked at the Orchards. Lewis Tr. 172-74. At his deposition, Lewis claimed that he had applied to move into a rental unit at the Orchards, that his application had been accepted. Lewis Tr. 175-76. Lewis says he had simply started moving his belongings—the pool table—into a vacant unit. *Id*. Hamlett contends that though Lewis did apply to move into the Orchards, his application was denied because he owed Apartment Services $300, and that Hamlett informed Lewis he could not transfer to the Orchards until he repaid his debt. Hamlett Tr. 121. On September 22, 2006, Hamlett spoke with Lewis about the pool table, and asked him to move it as soon as possible because new tenants would be moving into the unit the next week. Hamlett Tr. 125-58; Lewis Tr. 174-75.

### E. Lewis's Termination

On September 25, 2006, Hamlett terminated Lewis. Summ. J. Mem. Ex. 19. Hamlett explained that the termination was a result of Lewis's insubordinate behavior, taking unauthorized leaves of absence, and the pool table incident. Hamlett Tr. 132-35; Lewis Tr. 247. Notably, King did not participate in the termination, and was never made aware of the pool table issue. King Tr. 158, 163-64. On October 13, 2006, Hamlett hired Misty Harding, an African-American woman, to replace Lewis at Somerset. Via Aff. ¶ 22; Hamlett Tr. 95.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). After the moving party has established the absence of a genuine issue of material fact, the nonmoving party must present evidence in the record demonstrating an issue of fact to be resolved at trial. *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d

415, 422 (4th Cir. 1999)).  Summary judgment will be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

ANALYSIS

I.     **Race Discrimination Claim (Count I)**

Lewis may prove he was discriminated against through either direct or circumstantial evidence.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir. 2007).

    A.     **Direct Evidence**

Even viewing the evidence in the light most favorable to Lewis, he has not alleged any direct evidence of discrimination.  As this Court has explained, an isolated, stray remark will not be deemed direct evidence of discrimination.  *Escobar v. Montgomery County Bd. of Educ.*, 2001 U.S. Dist. LEXIS 1069, at *18 (D. Md. Feb. 1, 2001).  At most, Lewis claims that during his disagreement with King in July 2006, King accused Lewis of "play[ing] the race card."  Lewis Tr. 139-40.  As an initial matter, this comment does not rise to the level of a stray remark of discrimination as it shows that King did *not* want their discussion to be about Lewis's race.  Furthermore, there is no link between King's comment and Hamlett's decision to terminate Lewis as it is undisputed that King played no role in Lewis's termination.  King Tr. 158, 163-64.

    B.     **Indirect Evidence**

When a plaintiff has not alleged direct evidence of discrimination, a court must analyze the claim through the burden-shifting scheme laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Thus, Lewis may demonstrate a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he suffered adverse employment action;

(3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Id*. at 802. If Lewis makes this showing, the burden shifts to Apartment Services to produce evidence of legitimate, non-discriminatory reasons for terminating him. *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 214 (4th Cir. 2007). If Apartment Services does so, Lewis must then prove that Apartment Services's proffered reasons for terminating him are not true, but instead are a pretext for discrimination. *Id*.

### 1. Prima Facie Case

Lewis has not established a prima facie case of race discrimination. First, Lewis cannot show that he was replaced by a similarly qualified applicant outside of his protected class. There is no dispute that after Hamlett fired Lewis, Apartment Services hired Misty Harding, a black woman, to replace him. Via Aff. Ex. C. Furthermore, Lewis has not identified any similarly situated white employee who received preferential treatment. *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009). In his Complaint, Lewis makes vague allegations that three similarly situated white maintenance workers—Joshua Isner, Brandon Fortin, and John Taylor—violated the same leave policies and work rules that he did without penalty. Compl. ¶ 15. Lewis has not provided any support for these allegations in the record, however. Therefore, Lewis has not established a prima facie case of discriminatory termination.

### 2. Legitimate, Non-Discriminatory Reasons for Lewis's Termination

Even if Lewis were able to make a prima facie case of discrimination, Apartment Services has presented legitimate and non-discriminatory reasons for Lewis's termination that he has not rebutted other than through self-serving conclusory opinions. As described above,

Apartment Services terminated Lewis because of his unexplained absences, insubordinate behavior, and improper use of a vacant unit. *Holland*, 487 F.3d at 217. Lewis contends in response that: 1) King did not document Lewis's performance issues until after Lewis was terminated, 2) Hamlett approved of his placement of his personal belongings, i.e. the pool table, in the vacant unit, and 3) he followed King's "normal practice" of handling requests for personal leave. Opp'n at 14, 18.

First, Apartment Services has presented copious evidence that King was concerned about Lewis's work and insubordinate behavior over the course of their association. King and Hamlett have testified that they spoke on numerous occasions about King's feelings that Lewis was not performing at an acceptable level. King Tr. 167-69, 78; Hamlett Tr. 105-10. Apartment Services has also submitted King's detailed notes to Hamlett documenting Lewis's misconduct which were written prior to Lewis's termination. Summ. J. Mem. Exs. 15-17. Thus, Lewis's claim that King did not document his issues with Lewis until after Lewis was terminated is contradicted by the record.

Second, Lewis has not presented any evidence that he had authorization to move into a rental unit at the Orchards. Instead, Lewis's testimony that Hamlett was "not his normal self" when he found out about the pool table and asked him to remove it supports Apartment Services's claim that Lewis did not have permission to begin moving into the empty unit. Lewis Tr. 174-75. Furthermore, Lewis does not dispute that he continued to reside in an apartment at Arbuta Arms at the time he moved the pool table into the Orchards unit. Lewis Tr. 77-78.

Third, Lewis has offered no support for his argument that King implemented a different practice for employees requesting leave than Apartment Services's policies required. King has testified that his "normal" practice was to require vacation requests to be submitted in writing

one week in advance, and that employees call him with requests to take a sick or personal day, pursuant to company policy. King Tr. 190-92. As previously discussed, Lewis's claims that three white service technicians followed the same procedures he did in requesting and receiving approval for personal days without repercussion have no support in the record.

Finally, Lewis was hired and fired by the same person—Hamlett. The fact that the hirer and firer was the same individual and the termination occurred within a short time frame creates a strong inference "that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Accordingly, this Court grants Apartment Services's motion for summary judgment as to Count I.

## II. Retaliation Claims (Counts II & III)

Lewis also alleges that he was terminated in retaliation for complaining about unfair treatment in violation of Title VII and Section 1981. Lewis claims that he complained to Hamlett about King's second-guessing him on numerous occasions, and that he told Hamlett about King's alleged "race card" comment. Lewis Tr. 139-40. To state a prima facie case of retaliation, Lewis must show: (1) that he engaged in a protected activity; (2) Apartment Services acted adversely against him; and (3) the protected activity was causally connected to the adverse action. *Holland*, 487 F.3d at 218.

Lewis has not established that he engaged in protected activity. A "general complaint of unfair treatment does not translate into a charge of illegal discrimination." *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995). Though Lewis says he frequently complained to Hamlett that King treated him unfairly, Lewis does not claim that he told Hamlett he felt he was being treated this way because of his race. Additionally, Lewis did not complain to Human Resources or anyone else at Apartment Services about this perceived race

discrimination. Lewis Tr. 247; Via Aff. ¶ 23. Lewis highlights a letter he faxed to Hamlett on September 20, 2006—the day Hamlett learned about the pool table—purporting to show his belief that he was being discriminated against. Lewis Tr. 139-40; Summ. J. Mem. Ex. 22. Yet, this letter mentions nothing of race or discriminatory animus. Finally, Lewis's reporting King's "race card" remark to Hamlett is not protected activity since, at most, it shows that King did not want their disagreement to be about race. Apartment Services has provided a legitimate, nondiscriminatory reason for terminating Lewis which has not been rebutted. Accordingly, this Court grants Apartment Services's motion for summary judgment as to Counts II and III.

## CONCLUSION

For the reasons stated above, Defendant Apartment Services and Defendant The Home Sales Company's Motion for Summary Judgment (ECF No. 16) is GRANTED.

A separate Order follows.

Dated:   March 7, 2011          /s/_____
                                Richard D. Bennett
                                United States District Judge